**2024 UT App 194**

## THE UTAH COURT OF APPEALS

DOUGLAS REATH,
Appellant,
*v.*
BRIAN HEAD TOWN,
Appellee.

Opinion
No. 20240160-CA
Filed December 27, 2024

Fifth District Court, Cedar City Department
The Honorable Matthew L. Bell
No. 210500107

Bradley C. Harr and Jedediah C. Harr,
Attorneys for Appellant

Gregory N. Hoole, Attorney for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and MICHELE M. CHRISTIANSEN
FORSTER concurred.

MORTENSEN, Judge:

¶1    Douglas Reath was injured while using the Brian Head Town (Brian Head) bulk water dispenser to fill a large water tank in the back of his pickup truck. Reath brought a negligence action against Brian Head, and Brian Head moved for summary judgment, claiming that, as a matter of law, Brian Head's failure to warn was not the proximate cause of Reath's injuries because Reath already knew everything that might have been contained in a warning. We reverse the lower court's grant of summary judgment because under the applicable law, a properly instructed jury could reasonably conclude that Brian Head's failure was a proximate cause of Reath's injuries.

BACKGROUND

¶2    Douglas Reath, like many residents in the mountain community of Iron County, obtains water for his cabin from Brian Head's bulk water dispenser. To operate the dispenser, users employ the following procedure:

> (1) enter their four digit access number and hit enter; (2) enter their four digit pin and hit enter; (3) enter the specific amount of gallons they want to dispense and hit enter; (4) the dispenser will then ask the user if they are ready; (5) the user is to make sure the valve is closed and the hose is secure before hitting start; and (6) after hitting start, the user is to open the valve slowly until they reach the water pressure they desire.

¶3    At least, that's how the process is supposed to work according to Brian Head. But there are a few problems with those instructions. First, it seems that the actual directions provided to users varied. The instructions above, which Brian Head produced in response to an interrogatory, do not appear to be recorded anywhere or routinely distributed to users.

¶4    Reath recalls that when he initially set up his water account with Brian Head, the Brian Head employees only created his account, established his access code and pin, and advised him to be careful. In some other cases, Brian Head sent emails to residents that read, "Please make sure the valve is closed before hitting start. After hitting start, open the valve slowly until you reach the right water pressure" or, "Word of caution, the pump is like a fire hose, so I recommend making sure the valve is closed prior to starting and turning it slowly until you get the pressure you want." Internal Brian Head documents, which do not appear to have been distributed to users, contain the following warning: "CHECK THE <u>VALVE</u> AND MAKE SURE IT <u>IS</u> <u>CLOSED</u> BEFORE PRESSING 'START.'" There is no evidence that any of these specific warnings were given to Reath.

¶5    These explicit instructions make sense in light of the somewhat unique function of the dispenser. When a user is dispensing their water, they can either (1) stop the flow before the requested number of gallons has been dispensed by pushing the stop button or manually turning the valve off or (2) wait until all the water has been dispensed and the flow stops automatically. If a user lets their tank fill to the requested level and then forgets to close the valve after using the dispenser, the valve will be completely open at the start of the process for the next user, and when that next user pushes the start button, the water will immediately flow at an extremely high pressure.

¶6    In fact, when the bulk water dispenser was installed in 2011, the water dispenser pressure was at 180 PSI.[1] The installers "throttled it down" but expressed concern about subjecting the system to that level of continued pressure. In any event, on the day of the incident, the pressure level would have been that of a fire hose.

¶7    At the time Reath had set up his account, he had already observed people using the dispenser. By the time of the accident, Reath had personally used the dispenser about twenty-five times. Reath knew how to operate the dispenser and felt comfortable using it. He knew that it was good practice to make sure the water valve was closed before starting the water flow. And Reath generally followed this practice before the accident. He would "open it up a little bit and hit start, and then crank it up." But he was not always as "vigilant" as he could be in following this practice. On occasions when Reath strayed from these procedures,

---

1. PSI stands for pounds per square inch, and it is a unit of pressure commonly used to measure the force exerted by a fluid like water or air. For context, the PSI of a sink faucet is generally below sixty. Showerheads generally don't exceed eighty PSI. *See* Int'l Ass'n of Plumbing & Mech. Offs., *2024 Uniform Plumbing Code* 30-36 (2023), https://epubs.iapmo.org/2024/UPC [https://perma.cc/46AQ-LKVH].

he would "just hope it wasn't turned on full blast." Sometimes Reath would check the valve; sometimes he wouldn't. And historically, sometimes the valve would be open; sometimes it wouldn't.

¶8    In September 2020, Reath went to fill his water tank. In the past, Reath had always been the person operating the keypad, but this time he brought his "dear older friend" to help him. Reath stood on the bed of his truck holding the hose while his friend operated the keypad. Reath warned his friend saying, "[O]kay, when we hit start, this thing's going to take off, so make sure I'm ready." Reath was evidently not ready. Because the pressure valve was not closed when his friend pushed the start button, the pressure of the water immediately "pushed the hose out" of the tank. This caused Reath to lose his balance and fall to the ground, injuring his elbow and forehead.

¶9    After this accident, Reath learned that he could use camlocks to secure the hose to the two-way valve system on his tank. He has since used this method to fill his tank.

¶10   Reath brought a negligence action against Brian Head. Brian Head moved for summary judgment, arguing, "The undisputed facts show that Brian Head's alleged breach was not the proximate cause of Mr. Reath's injuries. This is because by the time of his injury Mr. Reath already knew everything about using the water tank that [Brian Head] could have told him." Following the briefing and a hearing on the motion, the district court granted Brian Head's motion.

ISSUE AND STANDARD OF REVIEW

¶11   Reath argues that the district court erred in granting Brian Head's motion for summary judgment. "We review a grant of summary judgment for correctness. We give no deference to the district court's legal conclusions and consider whether the court correctly decided that no genuine issue of material fact existed.

We review the facts in a light most favorable to the party against whom summary judgment was granted." *Heslop v. Bear River Mutual Ins. Co.*, 2017 UT 5, ¶ 15, 390 P.3d 314 (cleaned up).

ANALYSIS

¶12    "To prevail on a negligence claim, a plaintiff must establish four essential elements: (1) that the defendant owed the plaintiff a duty, (2) that the defendant breached that duty, (3) that the breach of duty was the proximate cause of the plaintiff's injury, and (4) that the plaintiff in fact suffered injuries or damages." *Hunsaker v. State*, 870 P.2d 893, 897 (Utah 1993). "The issue of negligence, or breach of a legal duty, is normally a question of fact for the jury." *Kitchen v. Cal Gas Co.*, 821 P.2d 458, 461 (Utah Ct. App. 1991). In contrast, "the question of whether a 'duty' exists is a question of law." *Weber ex rel. Weber v. Springville City*, 725 P.2d 1360, 1363 (Utah 1986) (cleaned up). But the questions of breach and causation are questions of fact that should ordinarily be left to the jury. S*ee B.R. ex rel. Jeffs v. West*, 2012 UT 11, ¶ 25, 275 P.3d 228 (breach); *Richmond v. Bateman*, 2024 UT App 103, ¶ 42, 554 P.3d 341 (causation).

¶13    Here, Brian Head's motion for summary judgment was based on the premise that "Reath cannot satisfy the third required element, causation, as a matter of law." *See Johnson v. Watts*, 2005 UT App 122U, para. 6 (stating that claims "fail as a matter of law for lack of evidence of causation"). But "causation is generally determined by an examination of the facts, and questions of fact are to be decided by the jury." *Arreguin-Leon v. Hadco Constr. LLC*, 2018 UT App 225, ¶ 30, 438 P.3d 25 (cleaned up), *aff'd*, 2020 UT 59, 472 P.3d 927; *see also Nielsen v. LeBaron*, 2023 UT App 29, ¶ 21, 527 P.3d 1133, *cert. denied*, 534 P.3d 751 (Utah 2023) ("In short, rarely can proximate cause be resolved without a finder of fact making that determination . . . ."); *Godesky v. Provo City Corp.*, 690 P.2d 541, 544 (Utah 1984) ("[P]roximate causation is generally a matter of fact to be determined by the jury.").

¶14 "Summary judgment is appropriate on a fact question only in the clearest cases, such as when reasonable minds cannot differ as to the inferences to be drawn from the undisputed facts." *Nassi v. Hatsis*, 2023 UT App 9, ¶ 35, 525 P.3d 117 (cleaned up). "Accordingly, summary judgment is generally improper on the issue of negligence and only in clear-cut cases, with the exercise of great caution, should a court take the issue of negligence from the province of the jury." *Kitchen*, 821 P.2d at 461; *see also Williams v. Melby*, 699 P.2d 723, 725 (Utah 1985); *Bowen v. Riverton City*, 656 P.2d 434, 436 (Utah 1982).

¶15 Summary judgment was improper here because reasonable minds can "differ as to the inferences to be drawn from the undisputed facts." *See Nassi*, 2023 UT App 9, ¶ 35 (cleaned up). When the facts are analyzed in light of the applicable law, this is not a clear-cut case. In other words, reasonable jurors properly instructed will not necessarily reach the same conclusion. When considering whether Brian Head's breach of duty caused Reath's injuries, it is not a given that a properly instructed jury could draw only one conclusion. This is particularly the case when we consider the facts in light of the law applicable here—sections 343 and 343A of the Second Restatement of Torts.

¶16 Brian Head argues that these questions need not go to a jury because Reath's claims "fail as a matter of law for lack of evidence of causation." *See Johnson*, 2005 UT App 122U, para. 6. Brian Head's argument is that because Reath already knew about the danger of the high-pressure hose, the lack of a warning, as a matter of law, did not contribute to his harm. This argument is inconsistent with current Utah law governing premises liability.

¶17 While the parties' briefing focused on cases like *House v. Armour of Am., Inc.*, 929 P.2d 340 (Utah 1996), and *Feasel v. Tracker Marine LLC*, 2021 UT 47, 496 P.3d 95, those are products liability cases—and this is a premises liability case. While the two lines of "cases share some common themes, the breach[es] alleged in *House* [and *Feasel*] arose out of a wholly separate duty found in a

wholly separate section of the Restatement." *Hale v. Beckstead*, 2005 UT 24, ¶ 18, 116 P.3d 263.[2]

¶18    Sections 343 and 343A of the Second Restatement of Torts establish the "duty of care that possessors of land in Utah owe to invitees upon their property." *Id.* ¶ 7; *see also Coburn v. Whitaker Constr. Co.*, 2019 UT 24, ¶ 12, 445 P.3d 446; *English v. Kienke*, 848 P.2d 153, 156 (Utah 1993); *Downham v. Arbuckle*, 2021 UT App 121, ¶ 13, 502 P.3d 312; *Laws v. Blanding City*, 893 P.2d 1083, 1085 (Utah Ct. App. 1995). And thus the question of whether a party breached its duty and whether that breach caused the plaintiff's injuries should be considered in light of sections 343 and 343A.[3] Accordingly, our determination on whether reasonable minds can differ as to the outcome of this case must be made in light of those sections.

¶19    Section 343 reads,

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and (b) should expect that they will not discover or realize the danger, *or will fail to protect themselves against it*, and (c) fails to exercise reasonable care to protect them against the danger.

---

2. Prior to oral argument we asked the parties to come to argument prepared to discuss the Restatement sections and associated case law.

3. Indeed, the model jury instructions relevant to this case borrow directly from these sections of the Restatement. *See* Model Utah Jury Instructions 2d CV1102, https://legacy.utcourts.gov/muji/?cat= 1 [https://perma.cc/YZ4H-NZBL].

Restatement (Second) of Torts § 343 (Am. L. Inst. 1965) (emphasis added).

¶20    As expressly relevant and highlighted here, section 343 makes clear that a possessor of land has a duty to invitees if the possessor knows of the condition, should realize it involves an unreasonable risk, should expect invitees will fail to protect themselves against it, and fails to exercise reasonable care to protect invitees.

¶21    At oral argument, Brian Head conceded that Reath was an invitee. Brian Head was well aware of how the bulk water dispenser worked. The undisputed facts reflect that Brian Head knew that the water pressure could be comparable to that of "a fire hose." And it knew that, given the setup of the bulk water dispenser, it was possible (indeed somewhat likely) that although no water appeared to be flowing from the dispenser, the valve could nevertheless be completely open. This occurred anytime a previous user let the dispenser stop after it had delivered the requested amount but that user failed to close the valve. Given this configuration, the next user would sometimes encounter an open valve, sometimes a closed valve. This unique set up—combined with the high water pressure of the dispenser—arguably created an unreasonable risk that Brian Head should have foreseen—or at least a jury could so find. And given the unpredictable nature of the risk, this may be a situation where invitees will fail to protect themselves. Under the undisputed facts, construed in Reath's favor, Brian Head knew all of this. Again, we need not answer these questions because those are issues of fact that ought to be addressed by a jury. But there's enough information in the record to suggest that this might be the case and that reasonable minds could differ on these questions.

¶22    Section 343A reads, in its entirety,

> (1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or

condition on the land whose danger is known or obvious to them, *unless the possessor should anticipate the harm despite such knowledge or obviousness.*

(2) In determining whether the possessor should anticipate harm from a known or obvious danger, the fact that the invitee is entitled to make use of public land, or *of the facilities of a public utility*, is a factor of importance indicating that the harm should be anticipated.

*Id.* § 343A (emphasis added).

¶23　While 343A is "often referred to as the 'open and obvious danger rule,' the Restatement provisions are actually substantially different from the old common law rule governing landowner liability bearing the same name." *Hale*, 2005 UT 24, ¶ 7. And sections 343 and 343A should be read together. *See* Restatement (Second) of Torts § 343 cmt. a (Am. L. Inst. 1965) ("This Section should be read together with § 343A, which deals with the effect of the fact that the condition is *known* to the invitee, or is obvious to him, as well as the fact that the invitee is *a patron of a public utility*." (emphasis added)). Here, the danger of the water pressure was perhaps not open and obvious, but Brian Head's argument rests on the assertion that it was *known*—an assertion that places this factual scenario squarely within the language of sections 343 and 343A.

¶24　Comment f to section 343A reads in part,

There are . . . cases in which the possessor of land can and should anticipate that the dangerous condition will cause physical harm to the invitee *notwithstanding its known or obvious danger*. In such cases the possessor is not relieved of the duty of reasonable care which he owes to the invitee for his protection. This duty may require him to warn the invitee, or to take other reasonable steps to protect

him, against the known or obvious condition or activity, if the possessor has reason to expect that the invitee will nevertheless suffer physical harm.

*Id.* § 343A cmt. f (emphasis added).

¶25 Thus, both section 343 and section 343A give expression to the idea that sometimes landowners must protect business invitees from dangers when the landowner knows or should know that a business invitee may be injured even if the dangers are known or obvious—where the landowner should expect that the business invitees "will fail to protect themselves against [the danger]," *id.* § 343, or should anticipate harm, *id.* § 343A. And whether the landowner should anticipate those things is a quintessential jury question.

¶26 For example, in *Hale v. Beckstead*, 2005 UT 24, 116 P.3d 263, a painter working in someone's home stepped off an unfinished balcony and was injured. *Id.* ¶ 3. The district court granted summary judgment in favor of the homeowner, reasoning that because the danger of the unfinished balcony was open and obvious, the homeowner had no duty to warn. *Id.* ¶ 4. This court affirmed that grant of summary judgment, but the Utah Supreme Court reversed. *Id.* ¶¶ 6, 40. Relying on the Second Restatement of Torts, the Utah Supreme Court explained,

> Where an invitee's attention may be distracted, such that he will not discover what is obvious, or will forget what he has discovered, or fail to protect himself against it, a possessor of land may be liable for breaching his duty of care if he fails to warn or to take other reasonable steps to protect the invitee. A possessor of land may also be liable for injuries an invitee sustains if the possessor has reason to believe that the invitee will proceed to encounter the known or obvious danger because to a reasonable man in his position the advantages of doing so would outweigh the apparent risk. While the invitee

may also share responsibility for his injuries, he may still recover from the defendant in proportion to the defendant's fault. Importantly, the invitee's negligence is not conclusive in determining the duty of the possessor, or whether he has acted reasonably under the circumstances.

*Id.* ¶ 26 (cleaned up).

¶27    As previously discussed, there is some evidence to support a finding that Brian Head knew that users might fail to protect themselves against the danger of the high-pressure hose. Under section 343A, even if Reath knew of the danger, Brian Head may still be liable if Brian Head should have realized Reath would be likely to forget or overlook a risk that Brian Head knew was present. Again, an invitee's knowledge of a danger does not foreclose the possibility of a landowner's liability. Yet that was the express basis of Brian Head's motion for summary judgment.

¶28    In *Downham v. Arbuckle*, 2021 UT App 121, 502 P.3d 312, this court described the open and obvious danger rule as requiring a two-step analysis. *Id.* ¶ 14. Step one is to consider whether the danger was known or obvious. *Id.* Step two involves considering whether the landowner should have nevertheless anticipated harm. *Id.* Under the language of the Restatement and the relevant caselaw, *both* steps are required and neither is dispositive. *See id.* ¶¶ 13–15.

¶29    In its motion to dismiss, Brian Head suggests that Reath cannot recover on a negligence claim because he "already knew everything about using the water tank that [Brian Head] could have told him." But to say that Reath's prior knowledge of this potential harm absolutely bars any recovery is to skip step two altogether. That cannot be the correct analysis under our current law because "a possessor may still be liable if the possessor should have anticipated harm despite the invitee's knowledge of the danger or the danger's obviousness." *Id.* ¶ 13 (cleaned up).

¶30   Even outside sections 343 and 343A, Utah courts have determined in other contexts that a plaintiff knowing information that also could have been included in a warning does not alone merit summary judgment. For example, *Feasel v. Tracker Marine LLC*, 2021 UT 47, 496 P.3d 95, is a products liability case in which the plaintiff argued that the defendant failed to properly warn the driver of a boat of potential dangers. *Id.* ¶ 1. There, two men were riding in a fishing boat when it struck an unknown object in the water, throwing them both from the boat. *Id.* ¶ 6. Without a driver on board, the boat turned right and began to circle tightly in the water, trapping and repeatedly hitting one of the passengers. *Id.* ¶¶ 5–6. The boat was equipped with a safety lanyard device designed to prevent incidents like this by killing the engine when the driver was thrown from the boat. *Id.* ¶ 4. But the driver was not wearing the lanyard in this incident. *Id.* ¶ 6. One of the passengers sued the boat manufacturer "for failure to adequately warn of the dangers associated with not wearing the lanyard." *Id.* ¶ 7. The district court granted summary judgment in favor of the manufacturer, explaining that "because [the plaintiff] was aware of the warnings, any additional warnings would not have changed his behavior." *Id.* ¶ 16. This court reversed that grant, and the Utah Supreme Court upheld that reversal explaining that "in this case, whether [the manufacturer] owed a duty to warn [the plaintiff] does not turn on the personal understanding [the plaintiff] may have had of the dangers associated with not wearing the safety lanyard." *Id.* ¶ 31.

¶31   It cannot be said that because a person knew at one time the danger something posed, that the owner of that thing can never be held liable for the breach of a duty of care. This is equally true in a case such as this where Brian Head might have "reason to expect that the invitee will nevertheless suffer physical harm." *See* Restatement (Second) of Torts § 343A cmt. f (Am. L. Inst. 1965).

¶32   To be sure, there are cases in which, as a matter of law, there is no causal connection and thus no negligence. But even the cases that Brian Head cites are not analogous to the case at hand.

*See, e.g.*, *Wood v. United Parcel Service, Inc.*, 2021 UT 49, ¶ 13, 496 P.3d 139; *Crestwood Cove Apartments Bus. Trust v. Turner*, 2007 UT 48, ¶ 43, 164 P.3d 1247; *Harline v. Barker*, 912 P.2d 433, 439 (Utah 1996); *Mitchell v. Pearson Enters.*, 697 P.2d 240, 245 (Utah 1985); *Breton v. Clyde Snow & Sessions*, 2013 UT App 65, ¶ 10, 299 P.3d 13; *Bansasine v. Bodell*, 927 P.2d 675, 676–77 (Utah Ct. App. 1996).

¶33    For example, Brian Head cites *Bansasine v. Bodell*, 927 P.2d 675 (Utah Ct. App. 1996). In that case, a passenger of a vehicle was shot and killed by another driver after the driver of the passenger's vehicle engaged in some reckless driving. *Id.* at 676. The passenger's daughter brought a negligence action against the driver of the passenger's car, arguing that the driver's reckless driving was the proximate cause of her father's death. *Id.*

¶34    There, the court determined "that a reasonable juror could not find that [the] defendant should foresee that another driver on the road would fire a gun into his car simply because he shined his high beams on that person, passed him, then sped up as the driver tried to approach." *Id.* at 677. The court reasoned that such a conclusion would be unreasonable and, thus, reasonable minds could not differ as to the outcome of that case. *See id.* ("If such a response were so common as to make it foreseeable, the streets and highways of this country would be empty.").[4]

---

4. In 2024, these sentiments seem quaint. *Bansasine v. Bodell*, 927 P.2d 675 (Utah Ct. App. 1996), is an interesting study in determinations of reasonable foreseeability. Two men engaged in a significant road rage event involving alternately blinding each other with high beams, lane changes, hand gestures, and pistol brandishing, etc. *Id.* at 676. The pistol was fired, and a passenger in the other vehicle was hit and later died. *Id.* An heir of the dead passenger filed suit against the driver of the vehicle in which her father had been a passenger. *Id.* The driver was granted summary judgment and this court affirmed, stating, "The trial court

(continued…)

¶35 The situation here is a far cry from the facts of *Bansasine*. Where there the act of a driver shooting into another car was determined to be so unreasonable as to be objectively unpredictable and thus cut off the chain of causation, here the analogous question is whether Brian Head could reasonably have foreseen Reath injuring himself as a result of its alleged negligence or failure to warn. The answer to that question could be yes, no, or maybe so, but it's certainly not that no reasonable juror could ever so find.

¶36 Finally, under Utah's comparative fault scheme, it is possible for both the acts of a plaintiff and a defendant to be concurrent causes of harm. "Utah abandoned its contributory negligence tort scheme in favor of a comparative fault theory of tort liability when the state legislature enacted the Utah

---

properly held that under the facts of this case, [the] defendant could not have foreseen that his 'reckless driving' would lead to another driver firing into his car." *Id*. at 678. This holding reflects a bygone time. Indeed, this case's precedential value is not only limited to its facts but limited to its time. Would *any* reasonable person say one could not now foresee what happened? Multiple persons have been shot and killed in Utah road rage incidents just while this case has been pending. Many appellate court cases arise now from road rage incidents. *See, e.g.*, *State v. Archuleta*, 2021 UT App 66, ¶ 1, 492 P.3d 801; *State v. Watson*, 2021 UT App 37, ¶ 1, 485 P.3d 946; *State v. Farnworth*, 2018 UT App 23, ¶ 1, 414 P.3d 1053. Indeed, in *Archuleta*, Judge Orme wrote a concurring opinion to register his "indignation at the intolerable increase in 'road rage' incidents, now quite commonplace in our fair state." *Archuleta*, 2021 UT App 66, ¶ 38 (Orme, J., concurring). He also noted, based upon personal observation, that some of the "road ragers" are members of the bar. He admonished: "Stop it! If you are not inclined to stop it because it is the right thing to do, stop it because you risk being shot or run off the road if you do not." *Id*. ¶ 44. Thus, in present-day Utah, this type of incident is foreseeable indeed.

Comparative Negligence Act in 1973." *Hale*, 2005 UT 24, ¶ 19. And "[t]he 1973 act was subsequently revised and extended by the Liability Reform Act of 1986, which maintained the comparative liability regime while extending its scope." *Graves v. North E. Services, Inc.*, 2015 UT 28, ¶ 44, 345 P.3d 619. "Under the prior approach, a person who bore any portion of fault, no matter how slight, for his own injuries was barred from recovering against the primary tortfeasor." *Hale*, 2005 UT 24, ¶ 19. Under current law, "the fault of a person seeking recovery may not alone bar recovery by that person." Utah Code § 78B-5-818(1).

¶37 "In adopting this approach, the legislature has necessarily disavowed any tort theory of recovery inconsistent with comparative fault apportionment principles." *Hale*, 2005 UT 24, ¶ 21.[5] Where Reath's own negligence may at one time have operated as a complete bar to recovery, it no longer does. We in no way suggest that Reath is blameless—but he doesn't have to be to recover from Brian Head. It is quite possible that Reath bears some fault, or most of the fault, for what happened to him. But it's also possible that Brian Head bears some. The weight of each party's fault is also a question for the jury when, as here, reasonable minds could differ as to whether Brain Head breached its duty and contributed to (or caused) Reath's injury.

CONCLUSION

¶38 Because reasonable minds on a properly instructed jury could differ as to the outcome of this case, and because Brian Head's motion to dismiss is based on the erroneous argument that

---

5. At oral argument Brian Head contended that it was making an assumption of risk argument. However, "the doctrine of 'assumption of risk,' whereby a defendant is not liable for his negligence toward a plaintiff who has voluntarily assumed a risk of harm arising from the defendant's negligent conduct, is no longer recognized in Utah as a total bar to recovery." *Hale v. Beckstead*, 2005 UT 24, ¶ 21, 116 P.3d 263 (cleaned up).

knowing information that could have been contained in a missing warning precludes recovery, we reverse the lower court's grant of summary judgment and remand this matter for further proceedings.

————